*In Re* PETITION OF AMOS D. PALMER FOR WRIT OF HABEAS CORPUS.

PROVIDENCE—DECEMBER 3, 1904.

PRESENT: Tillinghast, C. J., Douglas and Dubois, JJ.

(1) *Insane Persons. Habeas Corpus.*

Petitioner, having been found not guilty of murder by reason of his insanity, was by virtue of an order of commitment issued by the governor, under the provisions of Gen. Laws cap. 82, § 22, on the ground that his going at large was dangerous to the public safety, committed to an asylum for the insane. Subsequently he caused a petition to be presented to a single justice, under Gen. Laws cap. 82, § 15, representing that he was not insane and was unjustly deprived of his liberty, and a commission was appointed

which reported that petitioner was insane and that he needed restraint for the safety of the community, which report was confirmed by the justice. Thereafter petitioner prayed for a writ of *habeas corpus*, setting forth that he was not a person dangerous to the public or himself and that there was no longer lawful cause for his restraint. Upon hearing:—

*Held*, that, in view of the above facts, petitioner must show by a clear and strong preponderance of evidence that he was not insane and that his going at large would not be dangerous to the public peace.

Evidence considered and petition denied.

PETITION FOR HABEAS CORPUS. · Heard on prayer of petitioner, a lunatic, and denied.

TILLINGHAST, C. J. Having heretofore decided that this petition should be tried by the court instead of by a jury—26 R. I. p. 222—and the case having been thus tried, we are now called upon to determine whether the petitioner is entitled to the relief prayed for.

It appears that some time after the petitioner was committed to the Butler Hospital for the Insane in pursuance of the order of the governor of the State, referred to in our former opinion, viz., on July 13, 1901, he caused a petition to be presented to Mr. Justice Douglas, under the provision of Gen. Laws R. I. cap. 82, § 15, representing that he was not insane and that he was unjustly deprived of his liberty, and asking that a commission be appointed to inquire into his mental condition to determine whether he was insane, and in consequence of that condition was justly deprived of his personal liberty.

That petition was granted, and Doctors J. W. C. Ely, George W. Carr, John W. Mitchell, and Eugene Kingman, all of them being well-known physicians of high standing and ability and long experience, were appointed commissioners to inquire into the mental condition of the petitioner and to report the facts bearing upon the same to said justice, together with their opinion as to whether he was insane and whether he should longer be detained in said Butler Hospital for cure or for restraint.

On February 26, 1902, said commission made report of their doings to said justice, in which they stated as follows: "We have complied with your instructions, and each has carefully

read the court record of the trial of Amos D. Palmer; that we have also examined several new witnesses, three of them acquainted intimately with the Palmer family, and also knew Amos D. Palmer from his infancy; another intimate with Amos from his twelfth year until his marriage; also the first and last attendants of Amos D. Palmer at the hospital, and likewise, three physicians who have had charge of him in the Butler Hospital; that we have carefully examined the records of the Butler Hospital, together with various letters of the said Amos D. Palmer, and have examined at length, several times, Amos D. Palmer himself.   We do also report and state that we are of the opinion that Amos D. Palmer is improved in his bodily health by the life he now leads, but that we find the moral and mental condition of the said Amos D. Palmer remains the same as when he was placed in the Butler Hospital, and that in our opinion he has defective moral sense, imperfect self-control, and a weakened mental condition.   That we believe him to be incapable of managing himself and his affairs, and insane by reason of a defective brain; that we also believe that by reason of his moral and mental incompetency he needs care and restraint for his own best good and the safety of the community.

"We therefore recommend that Amos D. Palmer be kept in Butler Hospital, or some similar institution, in order to secure protection both for himself and for the public from further consequences of his disease."

This report was confirmed by said justice, in the following language:

"PROVIDENCE, March 17, 1902.

"Having received the foregoing report, and given it due consideration, I hereby confirm the same.

"WM. W. DOUGLAS,
"Justice of the Supreme Court."

At the outset, then, we are confronted with the following facts, viz.: First, that the petitioner was found not guilty of murdering his wife, by reason of his insanity at the time of the homicide, and that his going at large was dangerous to the

public safety. And here it is proper to observe that there was no conflict of testimony, at the trial before the jury, as to the question of the insanity of Mr. Palmer, who was the defendant in the indictment, but all of the experts, both those produced by the State and those produced by the defendant, fully concurred in the opinion that the defendant was insane at the time of the homicide, and that he was therefore not responsible for his acts.

The following abstract from the record of the trial of petitioner in the Common Pleas Division, on the indictment for murder, shows the position which was finally taken by the attorney-general in the case, together with the formal reports of the experts in the case :

" ATTORNEY–GENERAL : May it please the court, since the adjournment in this case yesterday the experts who have been employed by the State, together with the experts employed by the defence, have had an opportunity to thoroughly and carefully examine, both · physically and psychically, the defendant in this case, and the experts for the State have submitted to me the following report, which I wish to read to the court.

" GEN. WILSON: There is no objection.

" THE COURT: You may read.

" (Attorney-General reads:)

" ' The undersigned physicians, appointed by you as attorney-general of Rhode Island, to assist and counsel the State in the trial of Amos D. Palmer, at present under indictment for the murder of his wife, have this day examined the said prisoner at length, have consulted with the medical counsellors for the defendant, have reviewed the evidence submitted and the facts obtained in relation to said prisoner yet to be presented in evidence, and, as a result of such examination, we beg to submit the following opinion : We believe that Amos D. Palmer, on the night of February 12th, 1899, at the time said Palmer shot his wife, was irresponsible by virtue of mental incompetency, and a state of unconsciousness and impaired will.

" ' We recommend that Amos D. Palmer be acquitted for the

reasons therein stated, but as his mental capacity is incurable, appropriate measures should be taken to protect the public and himself from further consequences of his disease.

> " ' (signed)
>> " ' PETER M. WISE,
>> " ' CHARLES P. BANCROFT,
>> " ' GEORGE F. KEENE.'

" A like report, signed by all the medical experts in the case, has been submitted to me:

" ' WILLARD B. TANNER, *Attorney-General.*

" ' SIR:—We, the undersigned, having examined Amos D. Palmer as to his mental condition, with reference to the indictment against him for the killing of his wife on the night of February 12th, 1899, hereby report that we jointly agree in the opinion that he is the subject of a mental disease and that the act was committed under the influence of that disease, and, in our opinion, he is therefore not responsible for his homicidal act, and proper measures should be taken to protect himself and the public from further consequences of his mental disease.

> " ' (signed)

" ' DRS. WISE, BANCROFT, KEENE, JELLY, VOSE, CHANNING, COWLES, PALMER, and FRNNER H. PECKHAM, JR.' "

The attorney-general then said:

" If your honor please, in view of the report submitted to me by the experts employed by the State, also by the eminent gentlemen who appear for the defence, and whose integrity and fairness has never been questioned, I feel that the interests of justice demands that I should consent to the advice given to me, that it is not for the interests of the State, or in the interests of justice that this trial should be prolonged further, that the verdict of skilled medical experts upon this man's capacity ought to be taken as a ground for the disposition of this case, and, therefore, I shall consent that a verdict of not guilty by reason of insanity be entered in this case, and that

the case should then take the usual proper course of being certified to the governor, that he may be confined.

"GEN. WILSON. In the recommendation that has been made by the attorney-general, of course the counsel for the defence heartily concur. Our only object in making a defence, or the defence that has been made for Mr. Palmer, has been that it is the natural outcome of the trial, so far, to develop his insane condition at the time of the homicide. We were advised by the eminent gentlemen who have been our aid and assistance throughout this trial, who examined Mr. Palmer very early, that their opinion was that which is now made jointly by all the distinguished gentlemen upon each side. Our contention has been that Mr. Palmer was irresponsible by reason of a mental disease, and so seems to be the report.

" The admirable address of the attorney-general just made, we heartily coincide with, and we are perfectly content to allow the verdict to be taken in that form, and that Mr. Palmer, for his own good now, and in the future, should, under the direction and wise counsel of the governor, be placed in charge of somebody qualified to administer to his wants and care for his mind, and to protect him in the future from what might be the consequences of his disease."

(1) In view of the entire unanimity of opinion upon the question then before the court and jury, the presiding justice very properly instructed the jury to the effect that, if they believed the uncontradicted testimony offered, it was their duty to render a verdict of not guilty by reason of insanity, which they very promptly did without leaving their seats.

The second fact with which we are confronted is that on the 26th day of February, 1902, the mental and moral condition of the petitioner remained the same as when he was committed to the hospital. Third, that he was then insane by reason of a defective brain; and fourth, that he needed care and restraint for his own best good and the safety of the community.

In view of these facts, and charged as we are with the high and imperative duty of protecting the people of the State, as far as lies in our power, from physical injury and violence at

the hands of irresponsible persons, we are of the opinion that in order to warrant us in discharging the petitioner from his confinement he must show by a clear and strong preponderance of evidence that he is not insane and that his going at large will not be dangerous to the public peace.

That so strict a rule does not obtain in all cases of this sort, that is, in petitions under the statutes of the various States, for the release of persons confined in insane asylums, we are well aware. But we think it should be the rule in a case like the one before us, and we therefore adopt it and shall be governed by it.

At the trial of the case before us, the petitioner produced a large amount of expert testimony, as well as considerable lay testimony, strongly tending to prove that he is not now insane, and that his going at large will not be dangerous to the public.

The former class of testimony comes from men of eminence in their profession, several of them having had long experience in the care and treatment of the insane and in diagnosing all sorts of mental ailments. They are also all men of high character and unquestioned probity, and their testimony is therefore entitled to very careful consideration, and, in so far as it is uncontradicted by other expert testimony, it must be taken at its full value; for, relating as it does to a question peculiarly within the knowledge of men who are skilled in the science of such diseases, it must be held to be controlling. *Sherman, Petitioner,* 17 R. I. 356; *Barker* v. *Lane,* 23 R. I. 224; *Bigney* v. *Fisher,* 26 R. I. 402.

We will now review, as briefly as may be, the salient points of the testimony offered in behalf of the petitioner, in order that we may intelligently determine as to its probative force and effect, and may fairly and impartially pass thereon in deciding the case. And in this connection it is to be observed that two questions are presented by the petition, viz.: 1, Is Amos D. Palmer insane at the present time? And, 2, Will his going at large be dangerous to the public safety?

If the evidence clearly and convincingly shows that both of these questions should be answered in the negative, the peti-

tion should be granted. If it fails to show that either of them should be thus answered, the petition must be denied.

As to the first question, most of the testimony now offered by the petitioner is to the effect that he is not now and never has been insane in the ordinary sense in which that term is used. Dr. Gay, who has had the immediate charge of the petitioner at the hospital for about three years, and who has made a careful study of his mental condition, testifies that he has never found any indication of perversion in him, that he has received no medical treatment at the hospital for insanity, or any of its allied symptoms or diseases, and that he (witness) has never seen any real insanity in the man or any impulses that would warrant more careful supervision. He further testifies, however, that petitioner impressed him at first, as having the comprehension of a boy of eighteen or twenty years of age. But that since then he has matured in a marked degree, so that he now has the judgment of a man of thirty or more. In this connection it may be stated that petitioner is now of the age of forty-three years. He further testifies that he considers the petitioner thoroughly sane at the present time. He classes the petitioner as a "high grade imbecile," and says that he will never reach full normal development. In defining the term "high grade imbecile," the doctor says: "It is a term describing what we may call technical insanity, . . . a mental disease without hallucinations or mania, but a disease in which there is some defect of the intellect which may or may not be capable of improvement. It is not insanity proper. I might class him under the head of psychopathic inferiority."

Dr. Ford, who was also at the hospital during a year of the time that petitioner was there, and who made a study of his case, testifies that the petitioner manifested no symptoms of insanity or delusions of any kind. He also classes him as a "high grade imbecile," and his definition of this term is—"a mental infirmity that can not be considered absolute insanity." He thinks the petitioner is not insane.

Dr. Cowles, who was one of the experts called by the petitioner at the time of his trial for the murder of his wife, and

who has studied the case from time to time, testifies that at the time of said trial the physical condition of petitioner was bad, that his dullness and apathy were noticeable, and that he had a sort of mental weakness which suggested general paralysis, but that he became somewhat better in those respects while he was at the jail; that his memory was poor and had a narrow range, and that he required a great deal of questioning to get at his understanding of his past history and experience; also that what are known as the "stigmata of degeneration," were manifested in him by lack of symmetry in the position of his ears, in the shape of his head, and in the defective development of his mouth—the upper jaw causing a crowding together of the teeth and defective development of the upper part of the face; that the right shoulder was three and a half inches lower than the left; that there was a deafness of his right ear, and some disorder in connection with the reaction of the pupil of the right eye. He testifies, however, that these physical defects do not indicate insanity, and that it would not be right to infer insanity from the presence of these stigmata. He also testifies that Mr. Palmer at the present time has no well-defined symptoms of insanity, and that he has no delusions or hallucinations. He further testifies that the petitioner was irresponsible at the time of the homicide because he was then sick and was in a condition of physical and mental disease, and that his condition at that time was induced by his continued habits of drinking; also. that there was combined with it what remained of the epileptic disposition of his childhood.

Witness here admits, in answer to a question by the attorney-general, that at the trial of the indictment for murder he testified that he regarded the condition that defendant had been affected with for a long time as one that was progressive and incurable. Also that, in a magazine article, written by witness in 1900, relating to the petitioner, he made the following statement: "That the conclusion was reached that Palmer was congenitally defective and never had developed normal intelligence, and that his condition had been aggravated by excessive drinking and sexual indulgences."

Dr. Hall, who has known the petitioner since his admission to the hospital, testifies that petitioner has received no direct treatment for his mental condition since he was at the hospital; that he has no bodily disease which positively indicates insanity, of however small degreee, and that he considers Mr. Palmer to be a sane man.

Dr. Jelly, who saw and examined Mr. Palmer shortly after the homicide was committed, and who has examined him several times since then, testifies that he thinks Mr. Palmer is not insane. In answer to a question by the attorney-general, the witness admits that at the trial of the indictment referred to he was called as a witness for the defence, and was then asked the following question: "State just the conclusions that you have arrived at? A. I have no doubt, upon the examinations which I have made at the jail, from what I have seen of him here in court, from his testimony, from the evidence that has been given here in court, and from frequent visits to the prisoner since he has been confined in this house—I have no question that Amos D. Palmer is a man of unsound mind, that he was of unsound mind and beyond his own control by reason of disease at the time of the homicide. I believe that he is wholly oblivious as to this crime by reason of his mental disease, and that he is in that condition where he needs care and restraint for the treatment of his mental disease. I have no doubt, also, that he is absolutely honest in everything he has told me. I don't think he is capable, by reason of defective mental powers, to conceive or concoct a plan. I don't think he could combine circumstances which would enable him to make a plan of defence. I think he is telling the truth when he says it is out of his mind, and that he has no memory of having shot his wife. I think that is absolutely true so far as I can judge. . . . I believe he should be treated as a defective, diseased man, put under care, and for himself and for the community he should be treated with the hope of doing him good and protecting him." This witness also testified at said first trial that he thought the disease was progressive. He agrees with the other witnesses that petitioner is a "high grade imbecile." And what he means by the use of this term is,

that the petitioner is imperfectly developed mentally. In answer to the question, put by the attorney-general at the trial before us: "In your opinion, was Amos D. Palmer sane or insane at the time he committed this murder?" the witness answered: "I think he was insane. I think he was entirely beyond his control. It was done without reason, and for that reason he was insane. Q. In your opinion, was he sane or insane at the time he was committed to Butler Hospital in 1899? A. I think he was insane in the way in which I have spoken. Q. Isn't this ground of high grade imbecility treated by the medical fraternity as a grade of insanity? A. I suppose any imperfect mental development or any weak mental development is, in one sense, insanity; it is unsoundness."

Dr. Channing, who has made the case of Mr. Palmer a special study, was asked the following question: "In your opinion, is Mr. Palmer at the present time a sane or an insane man? A. I should say that he was sane." In answer to the question, put by the attorney-general, the doctor admitted that he was retained as an expert by the defence in the trial of said indictment, and was then asked the following question, and gave the following answer: "You may state to the jury, in your own way, Dr. Channing, your conclusions. A. I think at the time of the homicide that Amos D. Palmer was irresponsible. I think that from birth he has been of feeble mental organization. And as a result of the very careful physical examination that I have made of him, as well as the mental examination, that he would be now classified as a high grade imbecile. I think, also, that he has been an epileptic; that on the night of the homicide he was in an epileptic condition. I think that as a result of this general condition on the night of the homicide he was subject to mental disease, and that the act was the result of that mental disease, and that he was on that night irresponsible." That in answer to the question: "Will you also state, as the other physicians have, your conclusion as to whether the disease is progressive, or if there is any probability of its cure?" witness admits that he then gave the following answer: "I think it will be progressive, and I see no chance of cure."

Dr. Tuttle, who has familiarized himself with Mr. Palmer's case, testifies as follows: "Q. Do you feel, doctor, that you are qualified, from your knowledge of Mr. Palmer, to express an opinion as to his present mental condition? A. I do. Q. Do you say that Amos D. Palmer is to-day sane or insane? A. If you include in insanity cases of lack of development, I should have to say insane. But in the ordinary acceptation of the term, I should say he was sane."

Dr. Blumer, the superintendent of the Butler Hospital, testifies that at no time has he regarded Mr. Palmer as an insane man.

Dr. McDonald, whose deposition was taken, and who has been connected with the Butler Hospital for the Insane for several years, testifies that he has known Mr. Palmer very intimately since he has been at the hospital; that he has carefully observed his character and conduct, as bearing upon his mental condition; that he has familiarized himself with the history of the homicide, and that in his opinion Mr. Palmer is sane at the present time; also that he has never manifested any sign of delusion, and that he believes he has no hallucinations of any sort. In answer to the question, put by the attorney-general, "Whether or not Amos D. Palmer has, in your opinion, a defective brain," the witness answered: "I think not." In answer to the question, "Have you seen any indication that Mr. Palmer had not been normal morally and mentally?" the witness answered: "No." Q. "Have you ever seen any indication that Palmer had been afflicted with. epilepsy? A. No. Q. In your opinion has he ever been afflicted with epilepsy? A. No. Q. Have you ever seen anything in Palmer as an individual, from your observation of him and from your acquaintance with him, that has caused you to think that he has ever been insane? A. No. Q. What is your diagnosis of his case from a medical standpoint? A. My opinion is that Mr. Palmer suffered from a disturbed state of consciousness at the time of the homicide, with consequent amnesia. Q. Was he sane or insane at the time of the homicide? A. Insane. Q. How long would such insanity last? A. I don't know. Q. Have you any opinion on the subject? A. Yes. Q. What is it? A. That

it disappeared shortly after his coming to Butler Hospital; how soon, I don't know. Q. Could you give it approximately? A. I should say about six months. Q. What form of insanity should you call that—any other name than simply an abnormal state of consciousness? A. Clouded consciousness. Q. Can you state, doctor, any scientific name for the mental condition in which, in your opinion, Palmer was at the time of the homicide? A. As we speak of it—alcoholic retrograde amnesia."

The testimony of Mr. Palmer himself seems to be clear and connected; he appears to the court to be a man of considerable intelligence, kindly, well-disposed, gentlemanly. And, judging him from our non-professional standpoint, we fail to see any signs of insanity or special abnormality either in his appearance or in his testimony.

The testimony of Mr. Addeman, his guardian, is to the effect that the petitioner is not insane.

Such, then, is a brief *résumé* of the testimony, offered by the petitioner, bearing upon the first question above propounded.

The testimony in favor of the petitioner bearing upon the second question hereinbefore propounded is mainly to the effect that it would not be dangerous to the public to allow him to go at large. It is largely conditioned, however, upon the future surroundings of the petitioner and the influences which shall be brought to bear upon him.

The testimony offered by the attorney-general, on the part of the State, also comes from experts of high standing, of large experience, and of undoubted integrity, and is to the effect that the petitioner is insane and that his going at large would be dangerous to the public.

Dr. Keene testifies that at the time of the trial in 1899 Amos D. Palmer was afflicted with a mental disease by reason of which he was irresponsible for the homicide which he committed. He also testifies that in his opinion the disease is incurable because of congenital defects in Mr. Palmer which witness does not believe are curable. That the petitioner is afflicted with congenital imbecility. Witness has examined petitioner during the present year, and testifies that he has no reason to change his opinion regarding his mental condition,

but that it is the same now that it was at the time of the trial. "Q. In your opinion, is Amos D. Palmer, to-day, sane or insane? A. He is insane, in my opinion; and if he were released and should commit a crime, I should consider him mentally irresponsible. I should qualify this by saying, under similar circumstances, viz.: under excitement, either by prolonged use of liquor or by sexual excesses. Under the same exciting circumstances, his nature is the basis which would be very easily excited by stimulants or any other excesses."

In cross-examination, the doctor testifies that petitioner is mentally and physically defective, but that he has unmistakably improved since his confinement at the asylum. "Q. As I understood your answer to a question asked by Mr. Justice Tillinghast, your opinion as expressed is substantially this: That Mr. Palmer, by reason of what you call a congenital defect, is a person who would be liable, if he should commit excesses, either in the way of drinking intoxicating liquors or sexual excesses, to revert to the condition in which you found him in 1899? A. Yes; and I will explain farther. Amos D. Palmer has been dominated during his whole life by a stronger mind. He was dominated during all his childhood, and even beyond his maturity, by his mother, and the domination of his wife commenced before his mother died, and after his wife died the domination was the best influence he has been under, saving, of course, that of his mother. I think, perhaps, his mother's domination of him was unwise at times, but I think he has been under wise domination for the last four or five years, and has therefore shown the best improvement that was possible in his case. Q. And so long as Amos D. Palmer continues in his present mode of life, would you expect to find that he was again in a dangerous condition? A. So long as he is dominated by a superior mind, which judges for him in reference to his acts and whatever he does, I think he would not be a menace. But if left to himself, I believe he would be a menace to himself, to his State, and to society."

Dr. Bancroft testifies that the petitioner was insane, in his opinion, at the time of the homicide; that he has often seen him since, and that he sees no cause to change his opinion, which was

formed at the trial with regard to the mental condition of Mr. Palmer. "Q. Do you consider him to-day sane or insane? A. Insane, in the sense that I regard imbecility as a form of insanity. Q. Will you explain that a little more fully, doctor? You spoke in the sense that you regarded imbecility as a form of insanity. Is that considered so by the profession? A. Yes, it is. In all the treatises on insanity it is regarded as a form of insanity, and specialists in this particular branch of medicine regard it as one of the forms of insanity. There is a popular definition, of course, which we have not considered here to-day. I should regard him as an imbecile, and insane for that reason. Q. In your opinion, would it be dangerous to himself or to the public if he were allowed to go at large, free from all restraint, to-day? A. My impression is that it would. Q. Why do you think that it would be? A. I think the underlying condition being the same as it was at the time of the homicide, under adverse influences, such as occurred at that time, there might be a repetition of the same kind of consequences. And without control, without supervision, I can see that he would again become a menace to society. It is in the unrestricted discharge from custody that I think the danger lies. Q. Taking Amos D. Palmer, doctor, with the history of his life, the history of his case as you heard it given at the trial, the knowledge you have gained in any way with regard to Palmer, if he should commit a crime, whether or not, in your judgment, he could be held legally responsible for it? A. Under circumstances similar to those which existed before, I should be obliged to regard him, as I did at the time, irresponsible." The witness defines insanity as consisting in any abnormal state of mind, any prolonged departure from a normal mental condition.

Dr. Perkins testifies that in his opinion Amos D. Palmer was insane at the time of the homicide, and on the ground of feeble mental development, and the effect of the prolonged use of alcohol upon his weak mind. He classes the petitioner as a high grade imbecile. He has seen and examined petitioner twice and sees no reason to change his opinion formed at the time of the trial. "Q. In your opinion, is Amos D. Palmer,

to-day, sane or insane?  A. Insane.  Q. In what particular? A.  Imbecility.  Q. Is that curable or not?  A. Incurable. Q. Do you consider he is a safe man for himself or for the public to be at large without restraint?  A. Not without restraint."

Dr. Lane testifies that he has examined Amos D. Palmer and read the record of the case, as reported, sufficiently to make himself familiar with the previous history of petitioner, and is of the opinion that he is insane and that he does not consider it safe that he should be allowed to go at large and free from all restraint.  "Q. You spoke of him as being mentally defective.  You heard the classing him as a high grade imbecile. I will ask you whether or not, in your judgment, that name would apply to Palmer?  A. I think so.  Q. Is that imbecility curable?  A. No, sir."

Dr. Kingman testifies that in his judgment the petitioner is insane by reason of a defective brain.  "Q. What class of insanity do you place him in?  A. I place him in the second class of insanity by reason of a defective brain, and in that class comes idiocy, imbecility, and feeble-mindedness.  That classes him as a high grade imbecile, getting along towards the line of feeble-mindedness.  Q. You consider he is a high grade imbecile, do you?  A. I think he is; yes, sir.  Q. What is your position with reference to the question of whether it is safe to allow him to go at large now?  A. I should say not yet. Q. What is the danger to the public, in your mind, in allowing him to be released.  A. The danger to the public is this: The two ruling passions of the man were women and wine; and he is liable to be upset and be attacked, and be governed by them, if he gets out.  And he has had no thorough test of whether he can withstand the temptation of women and wine. And until he has had that test thoroughly, I don't see how we can make up our minds that he is perfectly competent to take care of himself or his affairs.  .  .  .  The habit of the man's life has been bad with women and drink; and I don't know why the habit should not assert itself again if it had a chance."

Dr. Carr testifies that he sees a reason for changing his

opinion from that given to the court, in 1902, in regard to petitioner's mental responsibility. He sees a great change for the better in petitioner, but thinks that he should still be classed as a high grade imbecile, but not far removed from a sane man. "On most subjects he will be sane. I should draw a line at the use of alcohol. I think if he should continue to abstain from alcohol and continue in the same surroundings that he has had for the last five years, it will undoubtedly be a great benefit to him, as it has. On the other hand, I should not say that it would be dangerous to let him go from the hospital."

Dr. Ely testifies that there has been great moral, physical, and intellectual improvement in petitioner since the examination made three years ago. "Q. In your judgment, taking this part of your report, 'We believe him to be incapable of managing himself and his affairs,' I will ask you whether you have seen any reason to change that part of your opinion? A. It depends altogether upon the influence that he feels now. He is easily led one way or another, being a weak-minded man. If he should fall into the hands of upright people, straightforward people, he would do right. If he falls into the hands of those who are vicious, and wish to waylay him, he would be likely to do bad. Q. He needs somebody to guide him, does he not, for his own best good? A. Yes, sir."

Dr. Mitchell testifies to the effect that since examination which he previously made he sees great gain in petitioner's physical and mental conditions, and thinks that there are things that came up to the commission then as facts, in some ways, that are facts now, but they are so modified that witness feels that, notwithstanding petitioner's mental condition is better, still that he is weak-minded and ought to be cared for or be under the care of some proper person. "Q. (By Mr. Van Slyck, in cross-examination.) Do you consider that Mr. Palmer, in his present condition, is a person who, if at large, would be a menace to the community? A. Not as he is at present. . . . I ought to modify that. I believe that Mr. Palmer, if he is under proper care, guided, that he

would not be liable to commit anything against the community or himself if properly cared for or guided. I think if he is left to stray by himself he will be likely to fall into habits again that he has had in the past, and there would be danger of his committing crime again. Q. (By Mr. Justice Douglas.) Do you believe he has the capacity to take care of himself if he were given his freedom? A. Not by himself. Q. Without control? A. No, sir. . . . . I think he has better self-control in a marked degree."

It clearly appears from the foregoing summary that the testimony bearing upon the questions at issue is very conflicting. Eminent experts on one side are arrayed against eminent experts on the other side. Doctors disagree. A bare majority of those called are of the opinion that the petitioner is sane, while a large minority are of the opinion that he is insane. The former are also of the opinion that it is safe for the petitioner to go at large in the community, while the latter are of the opinion that his going at large would be dangerous to the public. And as to the testimony of the experts, called by the petitioner, bearing upon this second point, it is to be observed that it is based in the main upon the assumption that he will not be subject in the future to similar unfavorable influences as he was prior to the homicide. In other words, several of the experts substantially admit that, if the petitioner should again indulge in his vicious habits, which need not be here specified, and be thrown into his former or similar surroundings, the physical and mental conditions which existed at the time of the homicide might again appear.

That opinions based upon the assumption that the petitioner will have better surroundings and be subject to better influences in the future than in the past, and that if given his freedom he will be able to control his appetites and passions so as not again to become a menace to the public safety, are evidently and necessarily largely conjectural, or, at best, that they are based only upon probabilities, and hence not entitled to very much weight as evidence in a case of this sort, is apparent.

Moreover, the petitioner is necessarily being judged largely by his present condition and surroundings. He is now under

restraint. He is under the very best of influences, and the treatment which he is receiving is highly promotive of his mental and moral growth and development, and also of his best good physically, as is clearly shown by the very marked improvement which he has made in all of these directions during his confinement.

Judging him under such favorable circumstances regarding what will probably be his condition and conduct if released furnishes but slight evidence in support of the claim that he can yet be safely trusted to go at large. And we are bound to consider this testimony in view of his imbecility, his insanity as found by the jury and subsequently confirmed and established by a commission of lunacy composed of eminent experts, his former depraved habits and tendencies, and also in view of the appalling fact that he has taken a human life.

Not only is the expert testimony conflicting in that the testimony of the doctors called in behalf of the petitioner conflicts with the testimony of those called by the State, but it is also conflicting in that the experts called by the petitioner disagree with each other upon the question of his sanity at the time of and subsequent to the homicide, and also in that the testimony of the experts who were called by the petitioner when he was defendant in said indictment for murder sharply conflicts with their testimony as now given regarding the same question. They endeavor to explain the latter conflict on the ground that from their subsequent study of the case, and from the facts which have since come to their knowledge, they were mistaken in some of their conclusions at the former trial. But if mistaken then, may they not be mistaken now? At any rate, such a conflict naturally causes us to hesitate long before allowing such testimony to be controlling in a matter of so much importance to the public as is the release of a man who has taken a human life. In short, the evidence in the case, taken as a whole, fails to convince us that the petitioner is sane or that it is safe for him now to go at large.

We are therefore of opinion, after a very careful and diligent study of the evidence, and upon full and deliberate consideration of the case in all its phases, that neither of the

questions hereinbefore propounded can be answered by us in the negative, and hence that the petitioner fails to show that he is entitled to be discharged.

Finally, while the unfortunate condition of the petitioner excites our warm personal sympathy, and while we should be only too glad to release him from his confinement, yet, in view of the facts aforesaid, we do not feel warranted in doing so, and hence we must deny his petition.

We have examined the numerous authorities cited by the learned counsel for petitioner in their well-prepared brief, but do not find that, in so far as said authorities bear upon the questions before us, they are materially in conflict with the views which we have taken.

Petition denied.

*Charles A. Wilson, George H. Huddy, Jr., and Van Slyck & Mumford,* for petitioner.

*Charles F. Stearns, Attorney-General,* for State.