O. N. ADAMS, Appellant, v. ROBERT A. STEWART, Appellee.

**HABEAS CORPUS:** Trial—Findings.   The findings of the trial court on a trial in habeas corpus proceedings have the force and effect of a jury verdict.

*Appeal from Buchanan District Court.*—H. B. BOIES, Judge.

MARCH 11, 1924.

APPELLANT filed his petition for a writ of habeas corpus, alleging, in substance, that he was committed to defendant hospital by the commissioners of insanity of Linn County, Iowa, April 10, 1922; that he is illegally restrained of his liberty; that said illegality consists in this: that he is not now and never has been insane; that he is normal both mentally and physically, except that at periods he is afflicted with epileptic attacks. The writ was issued, and after trial the trial court dismissed the petition and discharged the writ. Plaintiff appeals. —*Affirmed.*

*John M. Redmond,* for appellant.

*Ben J. Gibson,* Attorney-general, *Neill Garrett,* Assistant Attorney-general, and *John L. Cherney,* County Attorney, for appellee.

PRESTON, J.—The question presented is almost entirely one of fact. There is a sharp conflict in the testimony at some points. This being so, we shall not go into the details. We have carefully read the record.

The hearing was had in April, 1923. There was some talk of a parole to plaintiff's sister. The talk of parole was on condition that the Linn County commissioners should consent thereto. Plaintiff's wife objected, and the commissioners did not consent. Later, and on September 28, 1923, the trial court dismissed the petition.

Stated briefly, appellant's claim for the evidence is that plaintiff, 52 or 53 years of age, had always lived on a farm with his wife, a son 25 years of age, a daughter 19, and a boy 17, until his commitment; that, some 17 years prior to the hearing, plaintiff became afflicted with epileptic attacks; that he ran his farm; that he was quiet when the spells came on him; that the fact that the accumulations of plaintiff and his wife were held in her name was the occasion for some friction between them and some bitterness by the wife against the husband's people because of this property matter and their efforts to get him out of the hospital. She told them they could take him out if they would take care of him, but they never said they would. On the trial, a brother of plaintiff's offered to take him and give him a trial. The day before his commitment, which was Sunday, there was

a transaction which will be described later; and there were other events which preceded.

Plaintiff's claim for this testimony is that he had two or three spells the night before, and that, weakened therefrom, he went to his brother's to inspect the brother's farm; that they walked several miles through the mud; that plaintiff was fleshy, and was badly galled and sore; that they met an old neighbor, who spoke of venereal troubles and of a man at the County Home who was badly afflicted; that these thoughts about this trouble, nervous and weakened as he was, bothered him, and for the moment unbalanced his judgment; that he talked loud and was boisterous in the doctor's office on Sunday morning, but did nothing violent or threatening until another doctor had gone out after an officer; that the talk he had with his neighbor had lodged the foolish notion about venereal trouble in his mind; that plaintiff does not remember raising the milk stool over his wife's head and threatening to kill her if she would not take him to town to see the doctor and be examined for the supposed venereal trouble; that there is no doubt that, for the moment, plaintiff was temporarily unbalanced.

On the other hand, testimony on behalf of the defendant is to the effect that plaintiff and his wife were buying the farm, the title to which was taken in the wife's name because, when it was originally purchased, she placed in it all the money that was put in, some $2,000, and plaintiff did not contribute anything at that time. At the time of the trial, there was still a balance of a few thousand dollars against the property.

The wife's testimony is that there was no trouble about the property; that they never had any difficulty except on a few occasions during some of his spells.

The son testifies that his mother was willing to divide the property with him, and that she had offered to do it on numerous occasions, but that plaintiff decided not to have it done.

The wife testified that the agreement was that, when the farm was paid for, the deed should be made, but that it was not yet paid for. She testifies that at one time she asked plaintiff why he wanted a deed, and he said, so that he could give it to anybody if he wanted to; that, at and before the time of plaintiff's commitment, he was suffering from an aberration or mental

derangement, and thought he had a venereal disease, and insisted that his wife also was so afflicted. He was boisterous and threatening, and there was considerable difficulty in controlling him. Plaintiff decided that he must go to town and see a doctor and be examined to determine whether he had the venereal disease. The family tried to dissuade him. As be became violent, the wife and oldest son on Sunday morning took him to town to the family physician for an examination, in the attempt to satisfy him, hoping that he would quiet down. At this time, plaintiff woke up about 4:30 in the morning and insisted on going to the doctor at once. The son promised to take plaintiff to the doctor as soon as he got his chores done. The petitioner threatened to kick his son out of the house for saying that, and threatened physical violence upon his wife if she would not admit that she had a venereal disease. The wife testifies she did not want to go to town because the roads were so bad.

"He said he would knock my head off if I didn't go. He had the milk stool in his hand, but did not hit me. I was sitting there milking a cow, and he came up behind me. He had milked his one or two cows. I have been to see him a number of times in the hospital, and sent him a box of fruit or candy or something like that every week until it got so cold the fruit would freeze."

When he arrived at the doctor's office, the doctor advised him that he was all right. This dissatisfied plaintiff, and he insisted that another doctor, Dr. Skinner, be called, plaintiff stating that Dr. Skinner knew all about it. After observing plaintiff for a few moments, Dr. Skinner went out and got the officers. While Dr. Skinner was absent, plaintiff became furious, and struck the old doctor, who had been his family physician and friend for a long time, and knocked him down. When the officers arrived, plaintiff was unmanageable. Straps were used. It took several men to take petitioner to the hospital.

There is evidence that at prior times petitioner had spells when he was mentally irresponsible, and did things which a rational man would not do. At different times he struck his wife, without provocation.

Plaintiff testified that he never, at any time, had any occasion to be angry at his wife, and that he never was. It is

claimed that plaintiff did not remember the different transactions and threats. The son testified that plaintiff killed a hog at one time because she had made her nest at a place other than where he wanted her to be; that he couldn't make her move, so he clubbed her to death; that the son tried to stop his father, who told him to keep still, or he would get some of the clubbing too.

The son testifies that plaintiff would generally kill about two calves every year in the process of breaking them to drink,— choked them to death; that the horses were beaten.

It is conceded that petitioner had rational periods when he was normal, and, as said, he managed his farm.

The defendant, Dr. Stewart, testified that, based on his personal knowledge, and on the records of the institution, plaintiff was a fit subject to be restrained; that the only safe thing to do was to keep him in the institution; that he had noticed plaintiff sitting around in an indifferent manner; that he has a sort of a childish nature; that he shows considerable mental deterioration, such as one would expect to find in a person having had epilepsy for several years.

"Our diagnosis is epilepsy in a cloudy state. There are times when he is unconscious psychologically. There are times when he doesn't appear to have any insight at all into his condition, and at no time is he perfectly rational."

Dr. Barry, on the staff in the hospital, who had immediate charge of plaintiff, made observations of plaintiff personally, from time to time; had seen him in convulsions and after the convulsions; at one time questioned him in regard to his actions when he was in these convulsions, and he said he didn't know what he did, and that, if he did anything wrong, he was very sorry.

"Outside of the convulsions, he is cloudy at times, after them. Sometimes have noticed him breathing hard in bed. Epileptics cause trouble in these furors that they have, or when they are in their clouded state, and they are supposed to be dangerous. There are certain oddities about him, but he is always pleasant, and answers questions, except when in the epileptic condition. I think he ought to be kept in the hospital. If he can be watched as well outside as he is in the asylum, I

suppose that would be all right, so far as I know. The only trouble is, they are pretty hard to take care of sometimes. A couple of husky men might do something; sometimes it takes five or six men. There is warning when these spells come on.''

Some of this testimony was denied or qualified somewhat on rebuttal, but there is a conflict in the evidence. There is evidence to support the finding of the trial court. Under such circumstances, we do not interfere. The finding of the trial court has the force of a jury verdict. *Addis v. Applegate*, 171 Iowa 150, 168; *Dunkin v. Seifert*, 123 Iowa 64; *Smidt v. Benenga*, 140 Iowa 399; *Morrison v. Dwyer*, 143 Iowa 502; *Hall v. Wintermute*, 154 Iowa 520.

It is not at all likely that the defendant would desire to restrain plaintiff in the hospital if it was not for his good. We agree with the trial court that it is for the best interest of the plaintiff, his family, and the public, that he should have the watchful care he receives in the hospital. The situation is unfortunate for him, and no doubt irritating to him; but, if he will try to control himself and co-operate with the hospital authorities, it will be beneficial to him, and a cure may be effected.

The judgment is—*Affirmed*.

ARTHUR, C. J., EVANS and FAVILLE, JJ., concur.