RUTH MADSEN, Appellee, v. CHAS. F. OBERMANN, Superintendent Cherokee State Hospital, Appellant; STATE OF IOWA et al., Appellees and Cross-Appellants.

No. 46819.

APRIL 2, 1946.

A. R. Nelson, County Attorney of Cherokee County, B. J. Maxwell, County Attorney of Cedar County, and R. S. Milner, of Cedar Rapids, for appellant and for Cedar County, appellee and cross-appellant.

John M. Rankin, Attorney General, and Robert L. Larson, Assistant Attorney General, for State of Iowa, appellee and cross-appellant.

Edward L. O'Connor, of Iowa City, and J. F. Loughlin, of Cherokee, for appellee.

OLIVER, J.— Appellee Ruth Madsen was born in 1915 and married Henry Madsen in 1934. They lived on a farm in Cedar County, Iowa, with their two children, Richard, born in 1935, and Ronald, born in 1938. June 2, 1942, the Commission of Insanity of Cedar County found Mrs. Madsen to be insane and committed her to the State Hospital for the Insane at Mount Pleasant. There she twice attempted suicide and twice escaped.

July 21, 1942, she was paroled to her husband, with the understanding she would be given a physical examination and would be placed in a private mental sanatorium in Des Moines. She was taken to Rochester, Minnesota, for the physical examination and also went with her husband on a trip to South Dakota. Although she continued to exhibit evidence of insanity she was not placed in the sanatorium but lived at home with her husband and children. For the purposes of this case it may be said the record indicates that in the early morning of September 14, 1942, she shot and killed her husband while he was sleeping and that for ten days thereafter she wandered through the countryside. She was apprehended and on September 28, 1942, was charged with murder in a county attorney's information. Shortly thereafter the district court of Cedar county made an order for her return to the State Hospital at Mount Pleasant, reciting that Mrs. Madsen had been merely paroled therefrom and not discharged as cured and said court had no jurisdiction to try her upon such charge. She was returned to Mount Pleasant and about October 1, 1942, was transferred to the State Hospital at Independence.

In September 1944 the district court of Buchanan county denied her release in a habeas corpus case, finding she had failed to show by a preponderance of the evidence that she had been restored to reason and was then sane. Thereafter, in September 1944, Mrs. Madsen was transferred to the Cherokee State Hospital. In August 1945, she petitioned the district court of Cherokee county for a writ of habeas corpus directed to appellant Obermann, Superintendent of Cherokee State Hospital for the Insane, alleging, "she has been restored to reason and is now, and has been for some time last past absolutely sane and mentally normal in all respects." The writ was issued. The return of appellant Obermann denied said allegations and asserted, "she is now insane, and that she is now a fit subject for detention." Trial to the court resulted in judgment September 11, 1945, finding she "is now sane" and ordering her discharge from custody. See section 3577, Code of Iowa, 1939. Thereupon the sheriff of Cedar county took her into custody on the murder charge and held her in the Cedar county jail.

October 6, 1945, defendant Obermann appealed to this

court, and State of Iowa and Cedar County, who came into this case in some manner not shown in the record, also appealed.

Shortly thereafter appellants applied to this court for an order staying the judgment of the Cherokee district court discharging Mrs. Madsen from the Cherokee hospital, which application this court denied.

October 23, 1945, upon application of the county attorney of Cedar county, the district court of Cedar county dismissed the murder charge. We are advised Mrs. Madsen has been at liberty since then.

Mrs. Madsen, six lay witnesses, and three doctors, one of whom is a psychiatrist, testified for her. Each of these witnesses testified that, in his or her opinion, she had regained her sanity. Three psychiatrists, including appellant Obermann, expressed opinions to the contrary.

Witnesses for appellee testified her married life was unhappy and that she was in ill health and exhibited evidence of insanity shortly prior to her commitment by the commission of insanity. Sometime after her transfer to the Independence hospital her health and mental condition began to improve. She testified she felt so much different and friends and relatives testified there was a marked change in her and she became very much herself again and acted as a normal person.

She was placed in charge of the clothes room at the hospital, helped care for patients, usually helped when spinal anesthetics were given, was called upon to help in a childbirth case and later helped take care of the baby.

She had done some haircutting at Independence and after her transfer to Cherokee in 1944 worked regularly in the beauty shop at that institution. The manager of the beauty shop (a former instructor in a school of cosmetology) testified Ruth Madsen picked up the work easily, quickly adjusted herself to new methods of operation, and was doing very well:

"In my daily contact with Ruth out there, I have not noticed or observed anything odd or irrational in her conduct or her behavior, and she appears in her behavior and conversation and work to be very much rational. I never looked upon her as being a crazy person. If I were to have met Ruth any place

than at the shop I would not have known there is anything wrong with her, because she never loses her temper and has all the patience in the world with patients. She appears very much to have a sense of humor. Some of them are rather depressed at times and she will always try to help them out, to cheer them up. I have not observed in Ruth Madsen any oddity, any queerness of conduct or demeanor. She is very nice to work with and she is capable and helpful and she never seems to tire. She just keeps on going until everything is cleaned up at the shop, and appears to be able to learn quickly. * * * I feel that she could become an accomplished beautician.''

Mrs. Madsen testified:

''My plans for the future, if I am released, and had the children, I would first establish a home and I would like to take a cosmetology course if I could.''

Letters written by Mrs. Madsen during the latter part of her confinement appear to be those of a normal person, are well written and indicate she was corresponding with her older son, then eight, or nine years of age. The printed record of her testimony indicates Mrs. Madsen was an excellent witness at the trial.

Dr. Woods, a former professor of psychiatry at State University of Iowa Medical College, and now a consulting practitioner, testified her behavior in the courtroom was normal, that she maintained a rather remarkable poise during a searching examination under exceedingly trying circumstances, that her memory was very accurate, her utilization of her knowledge was quite good, normal, and that her general level of intelligence corresponded quite well with her cultural level.

The principal disagreement between the expert witnesses was in their opinions as to the classification of Mrs. Madsen's mental ailment. Dr. Obermann and his witnesses diagnosed it as dementia praecox of the paranoid type, also referred to as schizophrenia, which, the experts testify, is practically incurable. Witnesses for Mrs. Madsen diagnosed it as of the depressed manic-depressive type, from which, experts on both sides agree, a person on recovery may never have another attack. Dr. Woods

diagnosed it to have been of the depressed manic-depressive type. He testified also:

"I am certain that Ruth Madsen has no sign of schizophrenia now, and that none of the symptoms I have seen or gotten in the evidence indicate schizophrenia. She does not have dementia praecox of the paranoid type or any other type now. She has nothing. I consider her normal, as I said at the outstart. I do not feel that there would be the slightest danger to society if Ruth Madsen were released by this Court, or that she might commit some other act similar to the one she has been charged with. * * * I feel that at the present time Ruth Madsen is completely restored to sanity."

I. One of the errors assigned by appellants stems from this diagnostic disagreement in the opinions of the experts. After an extended recital of the case history and symptoms of Mrs. Madsen's ailment, appellant Dr. Obermann testified he diagnosed it as dementia praecox, paranoid type. Upon cross-examination he was asked if, as a witness in State v. Perrin, whose history was similar to that of Mrs. Madsen, he had diagnosed Perrin's condition as manic-depressive. Dr. Obermann answered, "The history isn't similar. There are a lot of differences." In the next question the cross-examiner referred to the history of Perrin's ancestors. Opposing counsel objected "to this question and all succeeding questions touching upon the relative phases of the Perrin situation as contrasted to the Madsen as not proper cross-examination." Ruling was reserved thereon, but the question was not answered. Counsel for appellee then stated these questions were being asked for the purpose of testing the credibility of the witness and that, in order to save time, the official shorthand reporter's transcript of all the testimony given by Dr. Obermann in the Perrin case was offered in evidence. Such offer was objected to as not proper cross-examination and for the reason that no proper foundation had been laid.

Counsel for appellants later recalled Dr. Obermann, who was permitted to examine the transcript and testify as to what he asserted were differences between and distinguishing features of the two cases. Upon further cross-examination Dr. Obermann

testified (without objection) that he and Dr. Soucek (one of appellants' expert witnesses in this case) and the heads of other state mental hospitals, several years thereafter pronounced that Perrin, then held in the department for the insane of the state reformatory, had been restored to reason. Dr. Obermann was then asked if Dr. Soucek agreed with him that Perrin was then sane, and answered (without objection), ''Yes. That is the difference in the two cases. A manic-depressive psychosis clears up.''

The former case was a criminal trial in said court involving the sanity of one Robert Perrin. Therein Dr. Obermann first testified to his own name, position, that he was a physician and a specialist in psychiatry and had observed Perrin and secured his case history. The next question was what he observed and learned about Perrin. The answer to this question, with two interruptions by the examiner, occupies ten pages of the record. There were a few more questions and answers enlarging upon certain details of this testimony. The witness then testified that from his observation and the case history it was his opinion that Perrin was insane and that another psychiatrist was of the same opinion. Upon cross-examination in said former hearing Dr. Obermann testified:

''In some ways he shows a mixture of symptoms which are present in a number of mental illnesses; but, it seems to me, that the classification is that of a manic-depressive psychosis, depressed type; but you can't just say that and say it describes every detail. * * * It is more common that they don't have recurrence of depression, but the typical case will have attacks and in between them they can return to normal personality for them to go back to their station in life and their job or whatever they are doing and carry on in a satisfactory way.''

He also testified: ''No, I don't think it would be safe for himself and for others'' for the defendant to be released. (Just previously Perrin had shot and killed his mother and attempted to kill his father. He had also attempted suicide.)

It may be here said that the trial court in the case at bar stated, ''it would be impossible to find two cases more nearly

parallel than this case and the Perrin case," and pointed to the striking similarity of history, symptoms, and actions. This conclusion of the trial court finds substantial support in the record, and we are not disposed to disagree with it.

The purpose of the cross-examination of appellant Dr. Obermann was to discredit his expert-opinion testimony in the case at bar, that Mrs. Madsen's condition was not of a manic-depressive psychosis, depressed type, by showing that he had testified to a contrary opinion in a parallel case.

Authorities hold that great latitude may properly be allowed in the cross-examination of an expert witness, and that a broad discretion is lodged in the trial court in such matters. Mileham v. Montagne, 148 Iowa 476, 480, 125 N. W. 664; Brown v. Drainage District, 163 Iowa 290, 293, 143 N. W. 1077; Olson v. Shuler, 208 Iowa 70, 74, 221 N. W. 941; Dean v. State, 211 Iowa 143, 152, 233 N. W. 36. An expert may be impeached by showing that he formerly expressed a different opinion. Miller v. Mutual Ben. L. Ins. Co., 31 Iowa 216, 237, 7 Am. Rep. 122. When the expert has referred to some medical authority to sustain the opinion he has expressed the authority may be introduced in evidence for the purpose of contradicting him. Bixby v. Omaha & C. B. Ry. & Br. Co., 105 Iowa 293, 300, 75 N. W. 182, 43 L.R.A. 533, 67 Am. St. Rep. 299; Morton v. Equitable L. Ins. Co., 218 Iowa 846, 857, 254 N. W. 325, 96 A.L.R. 315. In La-Count v. General Asbestos & Rubber Co., 184 S. C. 232, 192 S. E. 262, 266, the expert had collaborated in preparing articles dealing with a matter about which he was being examined. The court held such articles were admissible in evidence in cross-examination. The testimony of Dr. Obermann in the former trial may be said to have been in the nature of an article upon the question involved in his expert-opinion testimony at bar. Seaman Store Co. v. Bonner, 195 Ark. 563, 573, 113 S. W. 2d 1106, 1111, involved the cross-examination of a doctor. The court said:

"At this juncture, it is proper to consider the third alleged error for which appellant contends there should be a reversal. In the cross-examination of one of these experts a rather wide range was allowed, no doubt properly so, and he was questioned

in regard to opinions expressed by him in one or two other cases of an almost exactly similar nature. He was asked if he did not make certain statements which were read to him from certified copies of his former testimony. This was in accordance with the rules of evidence permissible. Section 5197, Pope's Digest. This part of the examination of the witness was upon matters purely collateral, but it was upon cross-examination and may have tested the credibility of the witness.''

So in the case at bar, it was proper for the trial court, in the exercise of its discretion, to permit the cross-examiner's inquiry into the question of the conflicting expert opinions of the witness appellant, Obermann.

Appellants complain of the procedure adopted in proving the former testimony. They assert there was no foundation laid. This contention is without substantial merit. Dr. Obermann was asked about his testimony in the Perrin case and answered that the history was not similar and there were a lot of differences. Clearly, at this point the issue was whether the facts and circumstances upon which each opinion was based were substantially the same. Dr. Obermann admitted in effect he had testified in the former trial that Perrin's condition was manic-depressive. He denied the cases were parallel. Hence it was proper to introduce his former testimony to contradict this denial and show the two cases were parallel. See section 11353, Code of Iowa, 1939; Old Line Life Ins. Co. v. Jones, 206 Iowa 664, 668, 221 N. W. 210; Judd v. Rudolph, 207 Iowa 113, 117, 222 N. W. 416, 62 A.L.R. 1174; Duncan v. Rhomberg, 212 Iowa 389, 399, 236 N. W. 638.

The procedure generally followed in such cases is to refer to the witness his former testimony, question by question, and thereafter place in evidence such questions and answers as are not admitted. However, the former testimony here involved was practically an extended monologue dealing with everything Dr. Obermann had learned and observed about Perrin and his history upon which his expert opinion was based. Although the cross-examiner might have read this to the witness, the procedure adopted saved much time in the trial of the case, and inasmuch as the trial was to the court, could have caused no con-

470

fusion or misunderstanding. We have already noted that Dr. Obermann later took the transcript and pointed out what he asserted were essential differences between the two cases.

There were a few questions and answers set out in the transcript and placed in evidence which might have been omitted, such as the preliminary questions as to Dr. Obermann himself and his testimony on direct examination as to the opinion of another expert (Dr. Marker) and some of the relatively short cross-examination. However, none of such matters was in dispute or questioned by either side and some of them were established by other undisputed evidence. Under the circumstances, no prejudice resulted from the admission in evidence of all of Dr. Obermann's testimony at the other trial.

■ II. In connection with the foregoing assignment of error appellants complain that the court reserved rulings on their objections to evidence. Cases of this character are triable as actions at law and such objections should be ruled upon. See Bettenga v. Stewart, 214 Iowa 1284, 244 N. W. 279; McGlasson v. Scott, 112 Iowa 289, 291, 83 N. W. 974; Haaren v. Mould, 144 Iowa 296, 300, 122 N. W. 921, 24 L.R.A., N.S., 404; 53 Am. Jur. 116; Good Roads Mach. Co. v. Ott, 186 Iowa 908, 171 N. W. 721. Finnegan v. Sioux City, 112 Iowa 232, 235, 83 N. W. 907, states testimony to which objections were made and rulings reserved will be treated as in the case. The record in the case at bar affirmatively indicates the trial court treated the evidence as in the case and we so treated it in the foregoing division of this opinion and held its admission did not constitute prejudicial error. Hence no prejudicial error resulted from the reserving of the rulings.

■ III. Appellants contend the trial court treated the evidence in the Perrin transcript as substantive evidence and based its decision largely thereon. It may be assumed, without so deciding, that the evidence was admissible for the purpose of impeachment only. However, we do not think the record justifies the conclusion of appellants. The court discussed the testimony of the various expert witnesses in some detail and made reference to the Perrin case in connection with the discussion of the testimony of appellant Dr. Obermann. It was proper for the trial court to consider and weigh the testimony of this wit-

ness in the light of his former testimony and in so doing to compare the two cases.

IV. Appellants contend the Cherokee district court was without jurisdiction of the subject matter and that the only right of appellee to a trial on the question of her return to sanity was in the district court of Cedar county, under the criminal procedure provided by chapter 648, Code of Iowa, 1939.

Appellants rely upon State v. Murphy, 205 Iowa 1130, 217 N. W. 225, which held an adjudication of insanity by the commission was a nullity and hence was not a bar to procedure under Code section 13905, in chapter 648, because such adjudication was made by the commission after the district court had acquired jurisdiction under the criminal charge. That case is not here in point factually because Mrs. Madsen had been found insane before the date of the crime with which she was charged.

Code section 3577 provides all persons confined as insane shall be entitled to the benefit of the writ of habeas corpus and the question of insanity shall be decided at the hearing. And, as stated in Addis v. Applegate, 171 Iowa 150, 169, 154 N. W. 168, Ann. Cas. 1917E, 332, it is not necessary that the statute confer such right, because it is guaranteed by Article I, section 13, of the Constitution of Iowa and cannot be suspended or refused by legislation. Under the provisions of sections 12471 and 12472, Code of 1939, application for the writ of habeas corpus was properly made to the Cherokee district court. It could not have been properly made to the Cedar district court. State Institution for Feeble-Minded v. Stillman, 236 Iowa 1023, 20 N. W. 2d 417.

In 1942 the Cedar district court had ordered the criminal charge continued indefinitely because it had been made subsequent to appellee's commitment for insanity. Incidentally, that charge was dismissed in 1945, before appellants first suggested that it was a bar to appellee's right to the writ of habeas corpus. We hold that, under the circumstances, the undisposed criminal charge in Cedar county did not bar appellee's right to habeas corpus in the Cherokee district court to secure her release from the state hospital on the ground that she had recovered her sanity.

V. Appellants contend that because appellee, while insane, had committed a homicide, the burden was upon her to establish *by clear and convincing evidence* that she had recovered her sanity and that her discharge would not be dangerous to the public peace and safety.

They cite Code section 13907, which provides that if an indicted person shall be found insane under the procedure of Code chapter 648, *and* if his discharge will endanger the public peace or safety, the court must order him committed to the department for the criminal insane at Anamosa. Mrs. Madsen was not committed under chapter 648 but was merely returned to Mount Pleasant.

However, we think the likelihood of danger to the public peace or safety from the discharge of one claiming recovery of sanity is an element to be considered in every case having an appropriate factual background, irrespective of the procedure by which the person was found insane. This court has considered such element in the case of a person not committed under chapter 648 but whose conduct had been violent and dangerous, and also in the case of another who had been charged with a dangerous crime and had been committed under chapter 648. Adams v. Stewart, 197 Iowa 490, 197 N. W. 464; Molesworth v. Baumel, 198 Iowa 1293, 201 N. W. 41.

In this case there is substantial evidence that the discharge of Ruth Madsen would not endanger the public peace or safety. Although the trial court made no specific finding on this point we think it may be fairly said such conclusion inheres in the finding that she was sane and should be discharged.

No Iowa statute fixes the amount of proof necessary for the court to order the discharge of one claiming his restoration to sanity. Section 3577, Code of Iowa, 1939, merely states all persons confined as insane shall be entitled to the benefit of the writ of habeas corpus, and the question of insanity shall be decided at the hearing, and if the judge shall decide the person is insane, such decision shall not bar the issuance of a second writ.

Hazen v. Donahoe, 208 Iowa 582, 226 N. W. 33, states that the standard fixed by our statutory law for retention in a hospital

for the insane is that said person is insane and a fit subject for custody and treatment in the state hospital and that the burden is upon such person to show a recovery of sanity by competent and sufficient evidence. Bettenga v. Stewart, supra, 214 Iowa 1284, 244 N. W. 279, uses similar language.

. . In Weber v. Chicago, R. I. & P. R. Co., 175 Iowa 358, 383, 151 N. W. 852, 861; L.R.A. 1918A, 626, the court considered the status of one who had been charged with murder, committed to the department for criminal insane, and thereafter released. The decision points out that insanity having been adjudicated it will be presumed to exist until the contrary appears, and quotes a statement that the burden is upon a party who alleges restoration to reason to establish it by a preponderance of the evidence.

There is no suggestion in Adams v. Stewart, supra, 197 Iowa 490, 197 N. W. 464, Molesworth v. Baumel, supra, 198 Iowa 1293, 201 N. W. 41, or in any other decision of this court, that because of past criminal charges or dangerous conduct one seeking release may be required to prove his restoration to sanity by clear and convincing evidence. That one had been dangerously insane so that, if not completely recovered, his release would endanger him or the public peace and safety would be a factor to be taken into consideration by the court in determining whether his asserted restoration was sufficient that he was then sane. However, a finding of sanity may properly be made upon a preponderance of the evidence.

Appellants cite Ex parte Palmer, 26 R. I. 486, 59 A. 746; People ex rel. Thaw v. Lamb, 118 N. Y. Supp. 389; Barry v. White, 62 App. D. C. 69, 64 F. 2d 707; Ex parte Remus, 119 Ohio St. 166, 162 N. E. 740; In re Hogan, 232 Wis. 521, 287 N. W. 725.

In Ex parte Dubina, 311 Mich. 482, 487, 18 N. W. 2d 902, 903, appellant had been charged with murder, pleaded insanity, and was committed to the hospital for criminal insane, under statutes comparable to chapter 648, Code of Iowa. Later he brought this action to secure his release. The decision states:

"Appellant asserts the trial judge took the position that to be entitled to release appellant must prove 'clearly and

474

convincingly' that he was sane at the time of this hearing, and also that his release would not endanger public safety. That is not our understanding of this record. The trial judge did not hold that because plaintiff had not 'clearly and convincingly' shown he was sane and that his release would not be a menace to public safety, therefore appellant was not entitled to be released. Instead, after a painstaking review of the testimony, the court reached and announced this conclusion:

" 'The Court finds that petitioner now is insane, that his insanity is of the compulsive type, that his release would be likely to be harmful to other persons or their property.'

"We are not in accord with appellant's contention, as applied to this type of case, that the court should not have been concerned with the probabilities of appellant's release being a menace to others. This, as well as the welfare of the committed person, is one of the objects that the legislature sought to accomplish by the enactment of the statute under which appellant was committed. * * *

"The following is an acceptable statement of this phase of the law:

" 'The commitment to an insane asylum of one who has successfully defended a charge of crime by showing insanity usually occurs only in cases of homicide, and as the liberation from the asylum of one who has, while insane, killed a fellow being, is apt to be dangerous to the community, the court generally requires a stronger showing as to the restoration to sanity of such a one, in order to obtain his release, than in the case of an alleged incompetent who has never been convicted or charged with a crime.' 19 A. L. R. 719.''

The quotation from 19 A. L. R. 719 is the annotator's statement concerning the doctrine of some of the cited cases. Apparently the Supreme Court of Michigan did not regard that statement as implying that the petitioner must prove his case clearly and convincingly.

The trial court carefully considered the entire record, including the factual background of Ruth Madsen, and concluded she was sane and should be discharged. We will not assume the homicide and other matters were not given proper consideration

and weight. The findings of the trial court have the force and effect of a jury verdict. Such findings will not be disturbed when supported by substantial evidence. Adams v. Stewart, supra, 197 Iowa 490, 495, 197 N. W. 464. There was abundant evidence to sustain the findings and conclusion of the trial court in this case.—Affirmed.

BLISS, C. J., and HALE, MILLER, GARFIELD, SMITH, MANTZ, and MULRONEY, JJ., concur.

WENNERSTRUM, J., not sitting.