SEAMAN STORE COMPANY v. BONNER.

4-4929

Opinion delivered February 7, 1938.

564

R. S. *Wilson* and *Daily & Woods,* for appellant.

*Partain & Agee,* for appellee.

BAKER, J.   This is an appeal from the Crawford circuit court.   Suit was filed there on or about May 19th or 20th, 1937, alleging injury caused by a falling freight elevator in the business house of the appellant.

It is alleged in the complaint that certain parts of the elevator were old, worn and defective, and particularly that a wedge key used to fasten a pinion wheel on a shaft had worked loose, and that this loosening of the wedge key permitted the wheel to slip or turn upon the shaft, and the loaded elevator to fall and strike young Bonner, who was aiding in the operation of the elevator in moving merchandise from the first floor to the second floor of the store building of the appellant.   It was the contention of the appellee that the appellant knew, or, in the exercise of ordinary care, should have known of the loose wedge key; that a reasonable inspection would have disclosed the condition; that the appellant negligently failed to make inspections.

The appellant contended, first, that the loose wedge key was not discoverable by inspection and, second, that the loosening of the wedge key and the descent or falling of the elevator were simultaneous and, third, that the slipping out of the wedge key was an occurrence impossible of anticipation.

This case has been presented upon briefs somewhat voluminous and in addition upon oral argument.   There are several assignments of error presented by appellant. (1) The appellant was entitled to a directed verdict on the question of liability; (2) The appellant was entitled to a directed verdict on the issue of permanent impairment; (3) The appellant's motion to reopen the case for further testimony should have been sustained; (4) That appellee's counsel was guilty of improper and highly

prejudicial argument; and (5) The verdict of the jury is excessive.

We shall attempt to discuss and dispose of these several issues, devoting such attention to each as its real importance may seem to require, but we shall not attempt to quote in detail testimony of witnesses upon each of the several propositions, but must content ourselves with the statement of what we conceive to be the facts as stated most favorably for the appellee.

The elevator upon which the appellee was employed at the time of his injury was in the store or mercantile business house of the appellant company. It was about seven feet wide and ten feet long. It is what was known as a hand-power freight elevator operated to move freight and merchandise from the first floor to the second floor; the shaft upon which the drum was located, or to which it was connected by the operating machinery, was up at the top, or probably above the ceiling of the second floor; that a cable or cables went from the elevator to the drum upon which they were rolled or unrolled in the raising or lowering of the elevator. There were counterbalancing heavy weights. At the time of the injury alleged, the elevator was in use moving freight, a heavy load of merchandise, and two or three employees were engaged in this work. Power was applied by those operating the elevator by pulling or swinging upon a large rope; that perhaps only one would pull upon the rope at a time and he would step back and another would take his place until the elevator had reached the top, then a hand-brake was applied by pulling upon another rope which held the elevator in the proper position until it was unloaded. The shaft, at or about the ceiling of the second floor, was horizontal and upon it was fastened to what is called a pinion wheel. This pinion wheel had to be securely fixed so that it would not turn upon this shaft, or axis, but in the operation of the elevator the wheel would turn with the shaft or axis upon which it was fastened. The fastening device was a wedge shaped piece of iron or steel, perhaps one-half inch thick, and maybe a little more than that in height at the larger end,

and it tapered to a point at the other end, and this was driven into a slot cut into the shaft just wide enough to hold this wedge key set upon edge in the slot, and into a corresponding slot, or cut in the pinion wheel into which the wedge was engaged or driven, fastening the wheel upon the shaft. This is said to be a very simple and a very common device used generally in fastening wheels or pulleys upon shafts in many kinds of machinery and ordinarily it is deemed very secure.

This wedge key, immediately after the accident, was found to be loose and sufficiently withdrawn from, or out of the slot, to permit the wheel to turn upon the shaft; that it was burred and the smaller end twisted or bent. It was shown that it was repaired by filing off the burrs or roughened particles and straightened and was driven back into the slot.

At the time of the accident young Bonner and another employee, working together, were hoisting a load of freight on the elevator, and in doing so were standing on the first floor pulling upon a rope used for that purpose. Bonner had been pulling at the rope and stepped aside to permit his companion to take his place. We do not know just how high the elevator had gone, but evidently somewhat above the heads of the employees, when it fell with a crash that was heard by people in nearby houses, some of whom visited the scene immediately after the accident. In falling, young Bonner was struck upon the head and carried down with the elevator. A cut or gash was made upon his head and his upper lip was split. The elevator was pulled up and he was taken from under it. He was unconscious for a short time. There was not found upon examination, however, at that time or thereafter, any broken bones or fractures, or any depressions upon the cranium.

Within the next few days, after this accident occurred, young Bonner went two or three times for examination and treatment, and did walk in and out of the clinic or hospital where he was examined and treated. About ten days after the accident he filed this suit in the Crawford circuit court, and since that time he says he has not

been able to walk, at any time or on any occasion without having someone support him.

It is argued most seriously that we should hold, as a matter of law, that when this wedge key came loose the elevator could not be operated, that is to say, that the loosening of the key and the accident were simultaneous, and that no reasonable inspection would have disclosed the loosened condition of the key, if one had been made. We think this contention is open to a very serious doubt as to its accuracy. Those in control of the operation of the store building testified that they had been operating this elevator for a period of about ten years, and that no actual inspections had been made by them or anyone for the store building, except possibly an inspection made about two and a half years before the accident. The extent or thoroughness of that inspection, or for what purpose, is in no wise shown by any witness. It is said to have been made by one who is still a resident of Fort Smith.

Two or three witnesses used as experts, two of whom were employed by elevator companies, who had made inspections for such companies, testified in regard to inspections of elevators, and one who said he was a safety engineer for an insurance company and whose business it was to make inspections of elevators which his company insured. He said that ordinarily they made inspections at least once a year to determine the safety of elevators in order that they might avoid accidents and losses caused thereby. Some of these witnesses indicated, however, that most of the inspections of elevators where wheels are fastened to axles with the wedge key device such device is ordinarily not very closely observed, if noticed at all.

The manager of the store testified that the next morning after this accident he and another man employed there made an inspection to determine, if possible the cause of the accident; that he sent a man with a flash light to examine this shaft upon which was fastened the pinion wheel with the wedge key; that the wedge key was found to have been loosened to such an extent

that the man making the examination removed it or pulled it out with his fingers and handed it to him. He also described the burred condition, the twisting or bending at the end of the wedge key as it was found when they removed it. From this testimony it is observed that the wedge key had not fallen or come out of the slot, but had only receded or slipped out to such an extent that the wheel was permitted to turn. It is possible that it may have become loosened in a very short time, but it is also possible that it may have been working loose over a long period of time. It is a certainty, however, that if it had been loosening or backing out of this slot over a period of years, as it is possible that it could have done, it reached the point on the day of the accident, for the first time, when the wheel was permitted to turn. The burred and twisted condition may have been caused by the pulling of heavy loads upon this loosened key. At any rate, it does not seem consistent with physical laws that the wedge key could have instantly slipped or backed out of the slot just far enough to permit the accident, and to have been safe and secure at all times prior thereto.

There is no suggestion that the appellee was charged with any duty in regard to the maintenance of the elevator, nor was he employed or required in any particular to make any inspection, nor is there any evidence that the condition of this wedge key and pinion wheel could have been discovered by him or any other employee, except as it was discovered the next morning after the accident by sending a man with a flash light into this darkened top part of the elevator to find what was wrong.

Since it is the duty of the master to exercise ordinary care to furnish a reasonably safe place and reasonably safe appliances wherein, and with which the servant may be employed, we cannot say, as a matter of law, that that duty was discharged by the master in the instant case. There is no pretense that it was. The defense is that inspection was unnecessary and would not have disclosed the dangerous condition. If the facts above stated do not present a typical case of negligence,

they do at least present a question of fact properly to be submitted to a jury for its determination. Negligence is not synonymous with intentional or wilful action. It may consist of inattention and the results be just as hazardous by reason of inattention or neglect as would follow from wrongful conduct.

Appellant, in its most exhaustive research, has presented many authorities for our consideration. We have selected, as typical, two well considered cases. The first of these, which we consider, is that of *Leonard* v. *Herrman*, 195 Pa. 222, 45 Atl. 723. That case quotes from another Pennsylvania case, *Titus* v. *Ry. Co.*, 136 Pa. St. 618, 20 Atl. 517, 20 Am. St. Rep. 944, as follows: "Absolute safety is unattainable, and employers are not insurers. They are liable for the consequences, not of danger, but of negligence; and the unbending test of negligence in methods, machinery, and appliances is the ordinary usage of the business. No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man. The test of negligence in employers is the same, and, however strongly they may be convinced that there is a better or less dangerous way, no jury can be permitted to say that the usual and ordinary way, commonly adopted by those in the same business, is a negligent way, for which liability shall be imposed."

Substantially the same, if not the exact language, just quoted above, was used in the case of *Spindler* v. *American Express Co.*, (Mo.) 232 S. W. 690, 693.

The soundness of the foregoing declarations is expressed by the well chosen language used, and if less were said than we have set out, we could not quote the above statements with approval.

Industry and business will not suffer when courts and juries realize that the fair test for determining liability of the master to the injured servant is the conduct of the average prudent man under the same or like conditions. When business and industry likewise take cog-

nizance of and uniformly follow the same fair rule, conditions will be ideal.

However sincere one may be in a belief that inspections and precautionary measures might not be available, he cannot neglect the employment of such precautionary conduct without the menace of such evil effects as naturally follow.

Appellants cite the rule announced in 45 C. J. 867. This is a pointed statement of the law and the last part of the quoted provision is no less practicable than the first part thereof, that is "the owner has discharged his duty if he has provided the elevator with appliances which are in common use and has exercised reasonable care in inspecting, repairing and management." Certainly appellant cannot be too insistent that no inspection made by it within a period of ten years and the only inspection made was two and a half years ago, and of which they now have no knowledge, is untainted with negligence.

This matter was submitted properly to the jury, men presumptively of experience in common or ordinary everyday affairs, and they have held against appellant's contention in that respect, and we think it apparent that the evidence is not only substantial but ample to support their finding on the question of liability. There is no real insistence that appellee was guilty of contributory negligence, but that he had assumed the risk in the operation of the elevator and unnecessarily was standing too near the elevator frame when struck. There was no danger at that point except such as arose out of appellant's negligence as found by the jury.

(2) The next question is one that has given us a great deal of trouble. The appellant insists that except for the small scars on appellee's head and lip that there is no substantial evidence of his injuries. The evidence in this case may not be as satisfactory as one would always like. Most of it is in a field or sphere with which laymen have little acquaintanceship and the facts are such that their truthfulness is not susceptible of actual demonstration.

Two physicians made an examination of young Bonner, and they say that all the symptoms or conditions found by them were subjective in their nature; that they learned of the facts from the history of the case as given to them by the appellee, by his parents, or other members of his family. They made tests, as we understand, to determine the accuracy of these statements and these tests so made corresponded with, and verified to their satisfaction, such subjective symptoms, pains and aches, and convinced them of the seriousness of appellee's injuries. There were lay witnesses who testified that the plaintiff had been constantly in bed since a short time after the injury, that he complained of certain pains and aches. He described the location of these pains. He testified to his inability to work or to exercise properly his limbs since about the 9th or 10th day after his injury. The physicians say he is suffering from traumatic neurosis. They say that it is the history of this particular trouble now recognized by physicians who treat injuries peculiar to industry, that after the injury, though it may be slight, or, at least, apparently not very severe, there is often a period of incubation of a few days, or possibly a few weeks, after which there is a complete breakdown so far as actual activity is concerned. This young man at the time that he testified said that for a time he could not hear very well, or at least his hearing in one ear was seriously impaired; that in that respect he has practically recovered; that his pains heretofore suffered are somewhat less regular and perhaps a little less severe; but he is still unable to work.

Other physicians examined this young man and except for the scars, one on his head and one on his lip, they say they found no kind of condition to justify a belief or opinion that he at any time suffered any serious injury or that there is at this time any real impairment. One of these physicians testified that after learning the subjective symptoms, the locations of the pains, that young Bonner claimed to have, he traced out the nerves from the head and back to determine if they had been injured and says that he found a normal condition as

to all these nerves at points or locations at which pain might have been induced, as claimed by Bonner. He found an absolutely normal condition of all the vital organs of the body, including the heart, lungs, kidneys and alimentary canal; that as to every test of the reflexes there was a normal response; that there is no condition prevailing at this time that indicates the impairment of any of the normal functions of the body.

It is, therefore, argued most seriously that the jury's verdict rendered in the face of this conflicting testimony must have been a matter of speculation. It is also argued that the two physicians who testified for the appellee, and who have given in their opinions a statement to the effect that he is totally and permanently injured and that he will perhaps never walk or work again is not the testimony of those who are experienced in the particular field and that they have not the ability of other physicians who profess to have somewhat more experience and a better opportunity for training and who gave a different view. It is not urged that the testimony given by any of these physicians was improper; that it should not have been heard by the jury, nor is it contended that the jury should not have considered all that was said by any one of them. In this part of the record, and we think there is no error about that part of it, it appears beyond dispute that this whole controversy in regard to the injuries and extent thereof were jury questions, properly submitted and correctly determined. At any rate, we cannot arrogate to ourselves that bit of superior knowledge which would qualify us to decide which theory was correct and which not. In that plane of physical and mental, or psychic phenomena, we must all depend upon those who profess to know for such information as we may receive. We are privileged in such controversies as the one under consideration to accept or reject as we choose.

It may be that young Bonner, instead of being a helpless victim on account of injuries suffered by reason of negligence of his employer, is now malingering or mayhap he is the subject of self-induced hypnosis without

apparent physical impairment. On the other hand there is a possibility, so far as we know a great probability, his body has undergone some organic change not susceptible to actual or demonstrable discovery. We have been cited upon this phase of the case to "A Text-Book of Clinical Neurology," published by Dr. Israel S. Wechsler, professor of clinical neurology of Columbia University.

"Following some trifling or more serious accident, which may or may not have been accompanied by temporary unconsciousness, many individuals develop a train of symptoms which are characteristic of the general neuroses. These symptoms usually set in after a so-called incubation period of a few days or weeks, and more seldom months, in which the individual is seemingly well and shows no signs of organic involvement of the nervous system. These syndromes generally follow industrial accidents; they have been observed during the war; they may occur in individuals who have merely been 'shocked' in railroad accidents or explosions without having received any demonstrable injury. Most commonly they follow blows to the head.

"The two main complaints are headache and dizziness."

The foregoing quotation, at least, demonstrates the fact that scholarly experts free from any contact or interest give serious consideration to such conditions, as, at least, two of the physicians found and determined to be present, in their examination of young Bonner.

Certainly, insofar as this question may be justiciable; it is one for the jury. It assuredly cannot be said to be a matter of law.

The foregoing comment made in relation to conflict in theories advanced by experts was intended to demonstrate the untenable position of appellant. The jury determines the credit due to be given to even expert witnesses and will not necessarily be bound by such testimony.

At this juncture, it is proper to consider the third alleged error for which appellant contends there should

be a reversal. In the cross-examination of one of these experts a rather wide range was allowed, no doubt properly so, and he was questioned in regard to opinions expressed by him in one or two other cases of an almost exactly similar nature. He was asked if he did not make certain statements which were read to him from certified copies of his former testimony. This was in accordance with the rules of evidence permissible. Section 5197, Pope's Digest. This part of the examination of the witness was upon matters purely collateral, but it was upon cross-examination and may have tested the credibility of the witness.

Finally it is urged that he was asked in regard to a certain former plaintiff in a suit by the name of Minton, if he had not expressed in the former trial that Minton had no real affliction or injury, and it was urged that Minton had been "planted" before the jury, somewhat old and apparently seriously crippled. An argument ensued between counsel and the witness, and immediately following the testimony so given by the witness, one of the experts, appellant's counsel called other witnesses who were examined and gave testimony in support of the statements made by the expert on the cross-examination. This proceeding was erroneous, but counsel for the appellee made no objection and counsel for appellant were permitted to pursue this course. Finally, Tom Minton, the crippled man about whom the witnesses were called upon to testify and whose condition or injury had not even a remote connection with the case upon trial, was called to the stand and permitted to testify in contradiction of the statements made by the expert in regard to his former condition and accident. Let it be remembered that this examination was in regard to collateral matters and, of course, the appellee was bound by the answers given by the witness; but after appellant had sought to bolster the testimony of the expert, then Minton was called and permitted to deny the statements made by the expert in his case, and this was done without objection and, however erroneous it might otherwise have been as it proceeded to that point,

there was no objection and no prejudice, unless it was invited prejudice. All occurred on Friday or Saturday afternoon. When each party had developed the case in regard to this particular new issue as much as was desired up to that time, both parties rested, and there was an adjournment of the court until the following Tuesday. At that time the appellant filed a motion asking permission to reopen the case in order that additional testimony might be presented to contradict the statements made by Minton in regard to this collateral matter. Appellee expressed a willingness to reopen the case, provided time was given to procure other witnesses who would testify in support of their theory. Until this state of the proceeding was reached, it must be conceded that there was no error that either party could urge for the reason that neither had interposed any objection or saved any exception. It appears that the court would have granted permission to reopen the case and would have permitted a resumption of the trial of this collateral matter, except for the fact that it would have caused undue delay to have permitted the appellee to bring from another county several witnesses desired. Appellant's motion was, therefore, overruled; and this order of the court overruling the motion is one of the assignments of error brought forward on appeal. Appellant's motion was accompanied by affidavits of several witnesses who were present ready to testify.

We intend to say nothing at this time that will impair in the least the right of any party to cross-examine any expert witness, nor is there anything that we would suggest that would impair the right to contradict any witness whether expert or not, and we do not think that the conclusions that we have reached in regard to this controversy will have that effect. We appreciate fully how far-reaching was the probable effect of this testimony, but the matter of reopening this case for the further development of a matter purely collateral was one of discretion. It was not proper for the court to permit an effort to bolster the testimony of the witness, or support it under such circumstances, and no doubt would

have sustained proper objections, but if the parties themselves were willing to enter into that controversy and did do it without objection, we know of no authority, and certainly none has been cited, that would require the court to permit a continuation of trial of issues collateral, and more particularly is this true after both sides had announced they had finished their evidence. It was urged that this testimony that they wanted to offer was newly discovered, but, even if it had been so considered, the court might properly have ended this roving investigation at any time and most certainly upon investigation. There is a question in regard to the fact of whether the evidence was newly discovered, or was already known at the time of the adjournment after each party had closed his case. Some evidence was offered in regard to that fact and heard by the court before he made his ruling upon the motion and even that issue must be decided most favorably to support appellee's position.

Certainly in the exercise of judicial discretion the court may have properly ruled as he did and prevented a further presentation of collateral matters. If all that was collateral must be disposed of in the trial of issues, trials like this might perhaps continue indefinitely. There are many authorities correctly announcing the principle of law in regard to impeachments, but we will content ourselves with citing *Taylor* v. *McClintock*, 87 Ark. 243, 112 S. W. 405, and *McArthur* v. *State*, 59 Ark. 431, 27 S. W. 628. We think it must appear that in an investigation of collateral matters, if permitted, the investigation must end at sometime with one side perhaps having the advantage. It is better that they be left alone. On this point we see no error.

Fourth, we have made a careful examination of the alleged errors arising from argument of appellee's counsel. We do not think prejudicial error is shown, though perhaps some immoderate speech was employed and may be some incorrect deductions drawn and forcibly expressed. The court properly admonished the jury on two or three occasions when objections were urged.

We see no benefit to be had from any extended discussion of this matter. No part of the attorney's re-

marks come within the inhibitions announced in the authorities. Our latest cases are *Hogan* v. *State,* 191 Ark. 437, 86 S. W. 2d 931; *Missouri P. Rd. Co.* v. *Foreman,* 194 Ark. 490, 107 S. W. 2d 546.

Some remarks complained of were invited.

Fifth, it is urged finally that the judgment is excessive; that it is a result of passion or prejudice on the part of the jury. It can serve no useful purpose to make a repetition of all the testimony. It will suffice to say that the appellee was a young man about twenty years of age with an expectancy of about or approximately forty years. He was a graduate of high school, expecting and attempting to earn money to go to the State University. At the time of the accident, though he had worked for this company for several months, he was earning only $9.50 a week. There is no evidence that he was in any line for promotion, or that there was any prospective increase in his earnings.

A computation of the amounts he might have earned at $10 a week, a little more than his actual earnings at the time of his injury, would have been less than $21,000 during the term of his expectancy. The present cash value of that amount would have been considerably less. The testimony shows that if the appellee suffered any broken bone that fact does not appear. It is not even urged that he did, though he testified his jaw was broken. There is no impairment so far as was discoverable by any of the physicians of any of the bodily organs, even the pain of which he complained had become less frequent and less severe. We think, therefore, that the verdict is excessive in that there is no substantial evidence to support it for the full amount given.

After due consideration of all these matters, we think that compensation for all pain and suffering, for impaired earning ability, if any, for all loss occasioned by injuries, the sum of $30,000 will be ample, and the error may be cured by a remittitur.

There are several cases in our reports sustaining judgments for this amount and some for larger sums, but in all those cases there was objective evidence of im-

pairment of bodily functions present. There was evidence of the destruction of earning power much greater than appellee's. It is unnecessary to cite cases.

Since we have determined that the verdict is excessive by at least $10,000, the error may be cured by a remittitur of that amount. If the appellee will enter a remittitur within fifteen days reducing the judgment to $30,000 it will be affirmed. Otherwise it will be reversed and remanded.

GRIFFIN SMITH, C. J., SMITH and McHANEY, JJ., dissent.

SMITH, J. (dissenting). In the case of *Singer Manufacturing Co.* v. *Rogers*, 70 Ark. 385, 67 S. W. 75, 68 S. W. 153, Justice RIDDICK, speaking for an undivided court, said: "The rule established in this court is that, even where there may be some conflict in the evidence, a new trial will be granted where the verdict is so clearly and palpably against the weight of evidence as to shock the sense of justice of a reasonable person; and the evidence here, we think, calls for this application of this rule. (Citing cases)."

We are now no longer shocked. We employ the verdicts of juries as shock absorbers. Certainly no one questions the jury's exclusive right to pass upon the truth of controverted issues of fact. But it does not follow, because juries have this right, that they have the right also to return any verdict which fancy, passion or prejudice may suggest.

The rule has been too often announced to be questioned that the verdicts of juries will not be disturbed on account of a finding of fact where there is substantial evidence to support that finding. Our reports are full of such cases, of which I have written a number, and I do not inveigh against or question them. But it does occur to me that there is a growing inclination on our part to shirk our responsibility in reviewing jury trials. We are becoming too prone to wash our hands of responsibility by saying that while a particular verdict should not have been returned and that our own sense of fairness and

justice is such that we would not have done so, yet we are concluded by the verdict of the jury.

The rule is firmly fixed by the numerous decisions of this court that we may not reverse a judgment as having been rendered upon insufficient testimony where the verdict upon which the judgment was rendered is supported by substantial testimony. I reannounce my adherence to this rule, and I shall continue in the future, as in the past, to apply it in determining how my own vote shall be cast in all cases that may come before this court during my service as a member of it.

But are we without power to review this testimony? Have we no function to perform in passing upon its legal sufficiency to support a verdict which may have been, and in many cases is, returned, not by the unanimous vote of the jury, but by the vote of only three-fourths thereof? I say we have a duty, of which we are not relieved by the fact that a verdict has been returned. On the contrary, this duty is not imposed upon us until we are called upon to review that verdict. We then have that duty to perform, and can only discharge it by determining, as a matter of law, whether there is a failure of proof or whether the evidence is legally sufficient to warrant the verdict.

In the case of *Catlett v. St. Louis, I. M. & S. Railway Company,* 57 Ark. 461, 21 S. W. 1062, 38 Am. St. Rep. 254, Chief Justice Cockrill said: "The test is as follows: After drawing all the inferences most favorable to the verdict that the evidence will reasonably warrant, is it sufficient in law to sustain the verdict?" The learned Chief Justice then proceeded to say that the legal sufficiency of testimony to support a verdict is not a question of fact, nor one of law and fact, but is a question of law upon which this court must pass. That question is not only not concluded by the verdict of the jury, but cannot arise until the verdict has been returned.

We have many cases holding that we will not reverse a judgment on account of the insufficiency of the evidence to support it where there is some evidence, or substantial evidence, or other phrases of similar import. The judges

writing these opinions have not always employed the same phrase, and some judges have chosen one, other judges a different phrase, but all were intended to express the same meaning, and Chief Justice COCKRILL defined the meaning of all these and similar phrases in the Catlett case, *supra*. He there said:

"The terms, 'some evidence,' 'any evidence,' 'any evidence whatever,' and 'any evidence at all,' as used in the opinions, all mean evidence legally sufficient to warrant a verdict. The legal sufficiency of evidence in that sense is a question of law, and the court must decide it, it matters not when or how it arises. The test that is applied by this court in determining the legal sufficiency of the evidence to sustain a verdict justified the trial court in reaching the conclusion that there was no proof of negligence. The conclusion followed as matter of law that no recovery could be had, upon any view that could be taken of the facts which the evidence could be said to tend to establish. The question of negligence was therefore one of law for the court to decide. *Texas & P. Ry.* v. *Cox,* 145 U. S. 593, 12 S. Ct. 905, 36 L. Ed. 829; *Grand Trunk Ry.* v. *Ives,* 144 U. S. 408, 12 S. Ct. 679, 36 L. Ed. 485.''

Shall we discharge that function here by applying the test which Judge COCKRILL said should be applied in all cases, and, if we do apply it here, can this judgment be affirmed, even though a remittitur has been ordered?

That the verdict was excessive we are all agreed. In the case of *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Adams,* 74 Ark. 326, 85 S. W. 768, 86 S. W. 287, 109 Am. St. Rep. 85, Justice RIDDICK announced the rule sustained by the many cases there cited, and from which we profess never to have departed, which should be followed in cases where excessive verdicts have been returned. He said: "Where the right to recover is clear, and has been established by the verdict of a jury, and where the errors committed in the trial go only to the enhancement of the amount of the verdict, and do not affect the question of whether defendant is liable or not, then, if the verdict be excessive, or if, on account of improper evidence, or im-

proper argument of counsel tending to enhance the amount of damages allowed, the court is not able to say from the evidence that the verdict is not excessive, and that the defendant was not prejudiced, in respect to the amount of the damages assessed, by such improper evidence or argument, the court may, in its discretion, name a sum which is clearly not excessive, and as a matter of grace to the plaintiff allow him to accept judgment for that amount, instead of a new trial. (Citing cases)."

The majority opinion reflects the fact that the right to recover in the instant case was not clear, and there were alleged improper arguments of counsel, and other assignments of error, so that if the judgment is as grossly excessive as I think the testimony shows it to be, the case is not one in which the plaintiff should be allowed, as a matter of grace, to enter a remittitur, but is one in which the judgment should be reversed and the cause remanded for a new trial.

Now, we must draw "all the inferences most favorable to the verdict," but this does not mean that we may now disregard, or that the jury, in performing its function, could have then disregarded, the undisputed evidence not favorable to the verdict. See *St. Louis-San Francisco Ry. Co. v. Harmon,* 179 Ark. 248, 15 S. W. 2d 310, and the cases there cited.

Here the undisputed evidence shows that the accident occurred May 10, and the plaintiff did not become bedfast until May 19, the day on which the suit was filed. Plaintiff himself admitted that he was able to walk prior to that day, and three disinterested ladies, near neighbors, all testified that they had seen him walking since the suit was brought. These witnesses testified positively that they had seen appellee out of his bed and moving around unassisted several times. Two of these ladies fixed the time definitely after May 19, and, in fact, only three or four weeks before the trial. An effort was made to prove these ladies were mistaken, although they testified positively they were not, but plaintiff's mother, when called to rebut this testimony, did not deny that appellee had walked to the bathroom, had walked to the kitchen sink, and had walked to the dining-table to eat.

Now, it must be admitted that doctors Post and Stewart, witnesses for appellee, expressed the opinion that the prognosis was bad, and that appellee was a hopeless cripple and would never walk again. But it must also be remembered that these doctors had never been called upon to treat appellee. They both admitted that they were not called to examine appellee until July 16, which was only a few days before the trial, and that they were called then for the sole purpose of testifying as experts, and both admitted that they were not specialists in nervous disorders. They both admitted that their opinions were largely based on what appellee had himself told them about his condition and his symptoms. This testimony would have been incompetent in many, if not most, jurisdictions. In the chapter on Evidence in 22 C. J., p. 269, it is said: "Where statements to a physician are made, not for the purpose of diagnosis and treatment, but in order to enable him to testify as a witness, the declarant's consideration of his interest in the result of the litigation may lead him to intensify his actual symptoms, or even to evolve new ones, for which reason statements made under such circumstances are usually rejected."

Our case of *Biddle* v. *Riley*, 118 Ark. 206, 176 S. W. 134, L. R. A. 1915 F, 992, held such testimony competent. A headnote in that case reads as follows: "A medical expert may base his opinion upon a clinical history of the case under consideration, and in order to make his testimony intelligible, he may testify to the observations that he made, and also as to what his patient said to him in describing his bodily condition and the character and manifestations of his sickness, pains, etc." In the same paragraph of the opinion in which that statement appears it is also said: "The reason for this rule is that the physician must oftentimes of necessity take into consideration such statements in reaching a conclusion as to the physical condition of the patient, and the nature and extent of his malady or injury; and hence the rule being founded on such necessity, it has been declared that it might be applied with caution, and not extended beyond the reason of necessity upon which it rests. It has been declared,

however, that the mere statements made by a person as to his sufferings, pain, etc., which statement was made for the sole purpose of furnishing the expert with information on which to base an opinion, is not admissible, and that the witness, in testifying to what he has heard and observed, is confined to exclamations, shrinkings (shrieking) and other expressions which appear instinctive, intuitive and spontaneous. 5 Encyclopedia of Evidence, p. 608.''

In the note to the text from 22 C. J., above quoted, our case of *St. Louis, etc., R. Co.* v. *Bostic,* 121 Ark. 295, 180 S. W. 988, 181 S. W. 135, is cited, in which case a headnote reads as follows: ''In an action for damages due to personal injuries, a statement by a physician that plaintiff told him that he was spitting blood some months after the injury, is inadmissible, when the physician had no first hand information that that was the case.''

It is an undisputed fact that doctors Johnson and Rose, the physicians who had treated appellee and thus had the opportunity to acquire first hand information, were not called as witnesses. Appellee might have called them had he elected to waive the privilege conferred by § 5159, Pope's digest. But the defendant could not have required these doctors to testify. The provisions of act 251 of the Acts of 1937, p. 909, do not apply. This act amends § 4149, Crawford & Moses' Digest, which, as thus amended, appears as § 5159 of Pope's Digest. This act provides that if a patient were attended by two or more physicians, and calls one of them to testify as to his ailment, he shall be deemed to have waived the privilege attaching to the other physician. Here appellee did not call either doctor Johnson or doctor Rose, and appellant could not do so.

Much stress is put upon the fact that appellee was struck on the head, and had his jaw broken, but both doctors Post and Stewart admitted that they found no broken bones or fracture of any kind, and that all of appellee's reflexes were normal; that there were no functional or organic diseases, and appellee appeared to be well nourished. Indeed, the testimony to this effect was

so overwhelming and undisputed that after several doctors, called by appellant, had so testified, counsel for appellee said: "We concede that the X-ray pictures taken show no fractures." It is also undisputed that there were no fractures or bone injuries, and all the doctors agreed there was no disalignment of the vertebrae, that the gash on the back of the head was a one-stitch gash and not apparently serious, and appellee's physicians admit that when their examination was made in July no evidence remained of the abrasion on the back and shoulders, that the lip and head had healed, and the laboratory tests show all functional organs to be sound and normal, and that the blood pressure was also normal.

The general character of the testimony of appellee is reflected in the examination of appellee's witness, Dr. Post, as follows. After expressing the opinion that appellee had been totally and permanently disabled to perform any manual labor, he made answers as follows: "Q. You say all reflexes were normal? A. Yes, sir. Q. Doctor, you didn't take any X-rays? A. No, sir. Q. You didn't make any other tests other than these you have described? A. Yes, sir. Q. All these tests you made called more or less for the honest co-operation on the part of the patient? A. Well, no, sir, they would act independently. Q. You say that reflexes would act independently and you found everything normal? A. Yes, sir. Q. When you called these things they required the co-operation on his part where you took the watch and found his defect in hearing? A. Yes, sir. Q. Tell the jury what symptoms that you discovered that indicated to you that he had traumatic neurosis. A. His inability to stand or walk. Q. And how did you determine that he could not stand or walk? A. We tried him; also from the history of the case. Q. Did he and his family give you this? A. Yes, sir. Q. Then you determined that by asking him if he could stand or walk, and he told you no? A. Yes, sir."

On his cross-examination Dr. Post further testified as follows: "Q. In your examination, you found nothing functionally wrong with his heart? A. No, sir. Q. The

blood pressure? A. Normal. Q. Kidneys? A. Acted all right. Q. Stomach? A. All right. Q. The intestines were all right? A. Yes, sir. Q. The bowels? A. Acted all right. Q. The spine, in so far as you knew? A. Alignment good, as far as I could make out. Q. You did examine his back, did you? A. Yes, sir. Q. You felt of it? A. Yes, sir. Q. The alignment was good? A. Yes, sir. Q. You couldn't observe anything from your own observation that indicated there was anything wrong with the spine? A. All right, as far as I could see.''

Appellee's other witness, Dr. Stewart, on his cross-examination gave substantially the same answers to these questions, and in addition made answers as follows: ''Q. In all of these type of tests that you made the reflexes were normal? A. The reflexes were normal. Q. When you go to hold a watch up to his ear, in making that test, he had to tell you about that? A. Yes, sir. He had to co-operate with you fully and honestly on that kind of test, or the test was no good and the test told you nothing? A. That's right. Q. Did you ask the boy to stand up? A. We asked him if he could and he told us no; we tried to set him up and he couldn't do it. Q. He told you that? A. He complained so bitterly, we didn't force him. Q. Why did you ask him to stand up? A. To be sure and see if he could, we wanted to know if he could.''

All the doctors called by appellant who had also examined appellee said they found no reason why appellee could not walk if he wished to do so. Only one of the doctors called by either side qualified as a nerve and brain expert, all others were general practitioners. This nerve and brain specialist expressed the definite and positive opinion that appellee would again walk after the case had been finally disposed of. His testimony may be summarized as follows: ''I made a neurology examination of the man and by that examination I examined this man's nervous system all over, and I found he had all the reflexes; he wasn't paralyzed in any part of his body; not any nerve coming off the brain was paralyzed, no paralysis at all, mentality clear, and from that examination I don't think he had any mental condition; he

was very well nourished and I couldn't find any injury; there was no disease of this boy's nervous system, or brain, or spine, or any nerve coming off of them." He enumerated the symptoms which would suggest a neurosis, and appellee had none of them. This specialist testified that he found appellee very unresponsive during his examination, that members of appellee's family were present during the examination, and that he detected appellee's sister coaching appellee during the examination, a fact which the sister did not deny.

After drawing all the inferences most favorable to the verdict, can it be said the opinions of doctors Post and Stewart, who admit that they examined appellee for the purpose of testifying in his behalf, and who admit also that their opinions are based largely on the subjective symptoms of which appellee complained, which were corroborated only by a couple of relatively insignificant scars, will reasonably warrant the verdict returned in this case and is sufficient to sustain the verdict? This, as Judge Cockrill said, is a question of law for this court to decide. I submit that the testimony is not sufficient, and as the excessiveness of the verdict is not the only error complained of, the plaintiff should not be allowed, as a matter of grace, to have the judgment affirmed for $30,000. The very passion and prejudice which induced the excessive verdict may have been responsible also for the finding by the jury that there was liability for the injury, and the judgment should, in my opinion, be reversed.

I am authorized to say that Chief Justice Smith and Justice McHaney concur in the views here expressed.